UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————— x

KATHLEEN SECKO, Individually and on
Behalf of All Others Similarly Situated,

                       Plaintiff,

      vs.

NORTHWELL HEALTH, INC.,

                 Defendant.

—————————————————————— x

Civil Action No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Kathleen Secko ("Plaintiff") brings this Complaint against Northwell Health, Inc. ("Northwell" or "Defendant"), individually and on behalf of all other similarly situated current and former employees of Northwell ("Class Members"), and alleges, upon personal knowledge as to her actions and upon information and belief and her counsel's investigations as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Northwell for its failure to properly secure and safeguard personal identifiable information ("PII")[1] and personal health information ("PHI")[2] of tens of thousands of Northwell's current and former employees, including, but not limited to, their name, Social Security number, taxpayer identification number, and medical treatment information.

2.      Northwell, through itself and subsidiaries, operates a health system that provides various medical services at over 1,000 locations in the State of New York.[3] Northwell bills itself as the largest health system in New York.[4] Northwell is a "covered entity" under HIPAA. Northwell employs nearly 100,000 people throughout New York.

---

[1]    PII generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. §200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2]    As defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, and its implementing regulations. *See* 45 C.F.R. §160.103.

[3]    NORTHWELL        HEALTH,        https://www.northwell.edu/doctors-and-care/locations?browse_all=true. (last visited Jan. 3, 2024).

[4]    *About Northwell*, NORTHWELL HEALTH, https://www.northwell.edu/about-northwell (last visited Jan. 3, 2024).

3.     Upon information and belief, and pursuant to HIPAA, Northwell entered into a Business Associate Agreement ("BAA") with Perry Johnson & Associates ("PJ&A") to provide medical transcription services on Defendant's behalf. Under the BAA, Northwell was required to not only obtain satisfactory assurances that PJ&A complied with HIPAA, but to monitor and oversee such compliance. Absent such oversight, and in the event of a HIPAA violation, Northwell – as the "covered entity" under HIPAA – was responsible for any harm.

4.     Prior to and through the date of the Data Breach (defined below), Northwell obtained Plaintiff's and Class Members' PII and PHI in the ordinary course of providing employment and/or medical services to them. Upon information and belief, Northwell then sent its healthcare providers' treatment notes to PJ&A to be transcribed into electronic medical records.

5.     As a direct and proximate result of PJ&A's data-security failures in violation of HIPAA, and Northwell's breach of its non-delegable obligations under HIPAA, Plaintiff's and Class Members' PII and PHI was accessed and exfiltrated from PJ&A by unauthorized actors beginning on at least April 7, 2023 through at least April 19, 2023 (the "Data Breach") – a period when the unauthorized actors had unfettered access to Plaintiff's and Class Members' PII and PII.

6.     PJ&A inadequately maintained its network security, platform, and software, rendering these easy prey for cybercriminals.

7.     Upon information and belief, PJ&A was on notice that its inadequate data security created a heightened risk of exfiltration, compromise, and theft.

8.     Although PJ&A's HIPAA violations are egregious, Northwell separately had a duty to maintain the security of Plaintiff's and Class Members' PII and PHI, and to ensure that its HIPAA business associate, PJ&A, had adequate and reasonable data security in place to safeguard PHI and PII and comply with HIPAA. Upon information and belief, it failed to satisfy those duties.

9.      After the Data Breach, Northwell failed to provide timely notice to the affected Plaintiff and Class Members – thereby exacerbating their injuries. Ultimately, Northwell deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Simply put, Northwell impermissibly left Plaintiff and Class Members in the dark – thereby causing their injuries to fester and the damage to spread.

10.      Even when PJ&A finally notified Plaintiff and Class Members of their PII's and PHI's exfiltration, PJ&A failed to adequately describe the Data Breach and its effects. Northwell has told Plaintiff and Class Members nothing.

11.      Plaintiff's and Class Members' identifying information is compromised and already in imminent jeopardy – all because of Northwell's negligence. Class Members have already been victimized by identity theft and fraud as a result of the Data Breach, and as a result, Plaintiff and all Class Members now suffer from a heightened and imminent risk of fraud and identity theft and must now constantly monitor their financial and medical accounts.

12.      Armed with the PII and PHI stolen in the Data Breach, criminals can commit a litany of crimes, and in this case, already have. Specifically, they can now open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' health information to craft phishing and other hacking attacks based on Class Members' individual health needs, use Class Members' identities to obtain government benefits, file fraudulent tax returns and applications for unemployment benefits using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

- 3 -

13.     Plaintiff and Class Members have already suffered and will likely suffer additional financial costs for purchasing necessary credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.     Plaintiff and Class Members have suffered – and will continue to suffer – from the loss of the benefit of their bargain with Northwell, unexpected out-of-pocket expenses, diminished value of their PII and PHI, and the value of their time reasonably incurred to mitigate the fallout of the Data Breach.

15.     Through this action, Plaintiff seeks to remedy these injuries on behalf of herself and all similarly situated current and former Northwell employees whose PII and PHI were exfiltrated and compromised in the Data Breach.

16.     Plaintiff seeks remedies, including, but not limited to, compensatory damages, statutory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief – including, but not limited to, improvements to PJ&A's and Northwell's data security systems, future annual audits, and adequate credit monitoring services funded by PJ&A and Northwell.

## PARTIES

17.     Plaintiff Kathleen Secko is a citizen of New York, residing in Hicksville, Nassau County, New York. Plaintiff was a Northwell employee until approximately June 5, 2022.

18.     Defendant Northwell Health, Inc. is a New York not-for-profit corporation with headquarters in New Hyde Park, Nassau County, New York.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because this is a class action involving more than 100 putative Class Members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Minimal diversity

is established because at least one member of the proposed Class is a citizen of a state different than that of Northwell.

20.    This Court has general personal jurisdiction over Northwell because Northwell's principal place of business and headquarters is in this District. Northwell also regularly conducts substantial business in this District.

21.    Venue is proper in this District under 28 U.S.C. §1391(a)(2), (b)(2), and (c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, and Northwell conducts substantial business in this District.

## FACTUAL ALLEGATIONS

### *Northwell Collected and PJ&A Stored Plaintiff's and Class Members' PII and PHI*

22.    Northwell was established in 1997 by the merger of North Shore Health System and LIJ Medical Center. Prior to 2015, Northwell was known as the North Shore-Long Island Jewish Health System.[5] Northwell's hospitals include Lenox Hill Hospital, which was established in 1857, Staten Island University Hospital, which was established in 1861, and Manhattan, Eye, Ear and Throat Hospital, which was established in 1869.[6]

23.    Northwell is the largest health system in the State of New York, employing more than 85,000 employees and treating over two million patients every year.[7] Northwell and its

---

[5]    *Northwell Health*, WIKIPEDIA, https://en.wikipedia.org/wiki/Northwell_Health (last visited Jan. 3, 2024).

[6]    *Id.*

[7]    *About Northwell*, *supra* note 4.

subsidiaries operate over 1,000 locations on Long Island, New York City, and Westchester and Rockland Counties.[8]

24.     Upon information and belief, in the course of providing employment and medical care to Plaintiff and Class Members, Northwell received and maintained Plaintiff's and Class Members' PII and PHI. These records are stored on Northwell's and its business partners' computer systems.

25.     Upon information and belief, in the course of providing medical care to Plaintiff and Class Members, health care providers employed by Northwell take notes that include PII and PHI relating to their individual medical conditions and treatments. Those raw notes are then transmitted to PJ&A, Northwell's HIPAA business associate, to be transcribed into electronic medical records.

26.     Because of the highly sensitive and personal nature of the information Northwell acquires and stores, Northwell and PJ&A knew or reasonably should have known that they must comply with healthcare industry standards related to data security and all federal and state laws and regulations protecting employees' and patients' PII and PHI and provide adequate notice to customers if their PII or PHI is disclosed without proper authorization.

27.     When Northwell collects this sensitive information, it promises to use reasonable measures to safeguard the PII and PHI from theft and misuse and to comply with HIPAA and its implementing regulations, including the duty to ensure that its business associates comply with HIPAA.

---

[8]    *Locations*, NORTHWELL HEALTH, https://www.northwell.edu/doctors-and-care/locations?browse_all=true (last visited Jan. 3, 2024).

28.     Northwell acquired, collected, stored, and represented that it maintained reasonable security over Plaintiff's and Class Members' PII and PHI.

29.     By obtaining, collecting, receiving, and/or storing Plaintiff's and Class Members' PII and PHI, Northwell assumed legal and equitable duties and knew, or should have known, that it was thereafter responsible for protecting Plaintiff's and Class Members' PII and PHI from unauthorized disclosure.

30.     Northwell promises to "protect[] the confidentiality of every patient's medical records."[9]

31.     Upon information and belief, Northwell represented to its patients orally and in written contracts, marketing materials, and otherwise that it would properly protect all PII and PHI it obtained.

32.     Northwell also owed duties to adequately store any PII it collected for its employees, including Social Security number and date of birth.

33.     A bailment was created (in contract and tort) between: (a) Northwell and (b) Plaintiff and Class Members when:

(a)     Plaintiff and Class Members (directly or indirectly) conferred their PHI and PII, which is Plaintiff's and Class Members' personal property, to Northwell's exclusive control;

(b)     Northwell accepted Plaintiff's and Class Members' PII and PHI; and

(c)     Said actions were made in exchange for:

(i)     Northwell's promises to render services (including healthcare services and essential data security measures) and employment; and

---

[9]     *Medical records*, NORTHWELL HEALTH, https://www.northwell.edu/manage-your-care/medical-records (last visited Jan. 3, 2024).

4878-4490-2303.v1

(ii)    Plaintiff's and Class Members' promise to render valuable consideration (including monies, employment services, and their PII and PHI) to Northwell from which Northwell derived revenue.

34.    The existence of a bailment between: (a) Northwell and (b) Plaintiff and Class Members created a duty on Northwell's part to properly secure Plaintiff's and Class Members' PII and PHI.

35.    Northwell's position as a custodian of Plaintiff's and Class Members' PII and PHI created a duty on Northwell's part to properly secure Plaintiff's and Class Members' PII and PHI.

36.    Among Northwell's responsibilities as custodian of Plaintiff's and Class Members' PII and PHI was to ensure that its vendors and business associates with whom Northwell shared Plaintiff's and Class Members' PII and PHI had in place reasonable security measures to protect that PII and PHI and complied with HIPAA.

37.    Upon information and belief, Plaintiff and Class Members relied on Northwell to keep their PII and PHI confidential and securely maintained, to use this information for business and healthcare or employment purposes only, and to make only authorized disclosures of this information.

38.    PJ&A could have prevented or mitigated the effects of the Data Breach by better securing its network, and/or properly encrypting its data and generally complying with HIPAA and other statutory, regulatory, and common law duties.

39.    Northwell could have prevented or mitigated the effects of the Data Breach by ensuring that PJ&A had appropriate data security measures in place, or better selecting its business associates to whom Northwell intended to and did disclose PII and PHI.

4878-4490-2303.v1

40.     The healthcare industry in particular has experienced a large number of high-profile cyberattacks even in just the short period preceding the filing of this Complaint, and cyberattacks, generally, have become increasingly more common. More healthcare data breaches were reported in 2020 than in any other year, showing a 25% increase.[10] Additionally, according to the HIPAA Journal, the largest healthcare data breaches have been reported beginning in April 2021.[11]

41.     In the context of data breaches, healthcare is "by far the most affected industry sector."[12] Further, cybersecurity breaches in the healthcare industry are particularly devastating, given the frequency of such breaches and the fact that healthcare providers maintain highly sensitive and detailed PII.[13] According to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in recent years.[14]

42.     Despite the prevalence of public announcements of data breaches and data security compromises, Northwell failed to take appropriate steps to protect Plaintiff's and Class Members' PII and PHI from being compromised.

43.     Northwell failed to ensure that PJ&A had in place the proper monitoring and logging of the ingress and egress of network traffic.

---

[10]   Steve Alder, *2020 Healthcare Data Breach Report: 25% Increase in Breaches in 2020*, HIPAA J. (Jan. 24, 2021), https://www.hipaajournal.com/2020-healthcare-data-breach-report/.

[11]   Steve Alder, April 2021 Healthcare Data Breach Report, HIPAA J. (May 18, 2021) https://www.hipaajournal.com/april-2021-healthcare-data-breach-report/.

[12]   Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breaches*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

[13]   *See id.*

[14]   *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SEC. MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

- 9 -

44.     Northwell failed to ensure that PJ&A had in place the proper monitoring and logging of file access and modifications.

45.     Northwell failed to ensure that PJ&A properly trained its employees as to cybersecurity best practices.

46.     Northwell failed to ensure that PJ&A had fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII and PHI.

47.     Northwell failed to timely and accurately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed.

48.     Northwell failed to ensure that PJ&A followed standard information security principles by, among other things, preventing unmonitored and unrestricted access to unsecured PII and PHI.

49.     Northwell failed to ensure that PJ&A properly implemented sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

50.     Northwell failed to ensure that PJ&A properly encrypted Plaintiff's and Class Members' PII and PHI and monitor user behavior and activity to identify possible threats.

***The Data Breach***

51.     On or about November 3, 2023, PJ&A sent Plaintiff and Class Members a Notice of Data Breach ("Notice") and submitted sample notices to various states' Attorneys General. PJ&A informed Plaintiff and Class Members that:

> **What Happened.** PJ&A became aware of a data security incident impacting our systems on May 2, 2023. We immediately initiated an investigation and engaged a cybersecurity vendor to further provide support in connection with our investigation and secure against potential system vulnerabilities. We promptly implemented the cybersecurity vendor-recommended actions to prevent the further disclosure of data as we continued to investigate the situation. Through our investigation, we determined that the unauthorized access to our systems occurred between March 27, 2013 and May 2, 2023 and the unauthorized access to Northwell patient data occurred between April 7, 2023 and April 19, 2023.

- 10 -

On July 21, 2023, PJ&A notified Northwell that an unauthorized party had accessed and downloaded certain files from our systems. PJ&A had preliminarily determined that Northwell data was impacted on May 22, 2023 and, by September 28, 2023, confirmed the scope of the Northwell data impacted.

**What Information Was Involved.** We have confirmed that certain files containing your personal health information were impacted by this incident. Specifically, the following information may have been impacted: your name, date of birth, address, medical record number, hospital account number and clinical information such as the name of the treatment facility, the names of your healthcare providers, admission diagnosis, date(s) and time(s) of service.[15]

52.    Although the Data Breach allegedly began on March 27, 2023, it was not until May 2, 2023, 37 days later, that PJ&A claims to have become aware of suspicious activity on its network.

53.    Upon information and belief, Plaintiff's and Class Members' PII and PHI was accessed, exfiltrated, and stolen in the Data Breach.

54.    Upon information and belief, Plaintiff's and Class Members' affected PII and PHI was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

55.    It is likely the Data Breach was targeted at PJ&A due to its status as a transcription service to healthcare providers that collect, create, and maintain both PII and PHI.

56.    While PJ&A claims to have become aware of the Data Breach as early as May 2, 2023, PJ&A did not begin directly notifying victims of the Data Breach *until November 2023* – over six months later.

57.    Time is of the essence when highly sensitive PII and PHI are subject to unauthorized access and/or acquisition. Plaintiff's and Class Members' disclosed, accessed, and/or acquired PII and PHI is believed to be available on the Dark Web as that is the *modus operandi*

---

[15]    Notice of Data Breach, attached hereto as **Exhibit A**.

for criminals who perpetrate attacks of this type. Hackers can access and then offer for sale the unencrypted, unredacted PII and PHI to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PII and PHI onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft and fraud, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

58.     Following the Data Breach and recognizing that Plaintiff and each Class Member is now subject to the present and continuing risk of identity theft and fraud, PJ&A advised impacted individuals to "regularly review your financial accounts and report any suspicious or unrecognized activity immediately."

59.     PJ&A and Northwell largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

60.     Time is a compensable and valuable resource in the United States. According to the United States Bureau of Labor Statistics, 55.5% of workers based in the United States are compensated on an hourly basis, while the other 44.5% are salaried.[16]

61.     According to the United States Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[17] leisure time is defined as time not occupied with work or chores and is "the time equivalent

---

[16]  *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS (Feb. 2021),                         https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour.

[17]  Cory Stieg, *You're spending your free time wrong – here's what to do to be happier and more successful*, CNBC (Nov. 6, 2019), https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html.

of 'disposable income.'"[18] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

62.    Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek remuneration for the loss of valuable time as another element of damages.

63.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII and PHI with the intent of engaging in misuse of the PII and PHI, including marketing and selling Plaintiff's and Class Members' PII and PHI.

64.    PJ&A also offered credit monitoring services for one year. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

65.    Northwell had and continues to have obligations created by HIPAA, reasonable industry standards, common law, state statutory law, and Northwell's own assurances and representations to keep Plaintiff's and Class Members' PII and PHI confidential and to protect such PII and PHI from unauthorized access.

66.    PJ&A's Notice letter, as well as the notice on Northwell's website, both omit the size and scope of the Data Breach.

---

[18]   *Id.*

4878-4490-2303.v1

67. Even today, Plaintiff and Class Members remain in the dark regarding how the Data Breach occurred, and what steps are being taken, if any, to secure their PII, PHI, and financial information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly PJ&A and Northwell intend to enhance their information security systems and monitoring capabilities so as to prevent further breaches.

68. Because hackers often release stolen PII and PHI in batches in order to maximize its value, instead of all at once, if not done already, Plaintiff's and each and every Class Members' PII and PHI and financial information will likely end up for sale on the Dark Web, or simply fall into the hands of companies that will use the detailed PII and PHI and financial information for targeted marketing without Plaintiff's and/or Class Members' approval. Either way, unauthorized individuals can now easily access Plaintiff's and Class Members' PII and PHI and/or financial information, and in many instances, already have.

***Northwell Failed to Comply with FTC Guidelines***

69. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[19] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Northwell, should employ to protect against the unlawful exfiltration of PII and PHI.

70. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[20] The guidelines explain that businesses should:

---

[19] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), https://bit.ly/3uSoYWF.

[20] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre.

4878-4490-2303.v1

(a)     protect the personal customer information that they keep;

(b)     properly dispose of personal information that is no longer needed;

(c)     encrypt information stored on computer networks;

(d)     understand their network's vulnerabilities; and

(e)     implement policies to correct security problems.

71.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

72.     The FTC recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

73.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74.     These FTC enforcement actions include actions against healthcare providers and partners like Northwell and PJ&A. *See, e.g.*, *In re LabMD, Inc.*, 2016 WL 4128215, at *32 (FTC July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[21]     *See Start with Security*, *supra* note 19.

- 15 -

75.     Northwell's failure to employ reasonable and appropriate measures to protect against unauthorized access to its employees' and patients' PII and PHI *vis-à-vis* its HIPAA business associate PJ&A constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

***Northwell Failed to Follow Industry Standards***

76.     Despite its alleged commitments to securing sensitive employee and patient data, Northwell did not follow industry standard practices in securing employees' and patients' PII and PHI.

77.     As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI that they collect and maintain.

78.     Several best practices have been identified that at a minimum should be implemented by healthcare providers like Northwell and its HIPAA business associates, like PJ&A, including, but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

79.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

80.     Northwell failed to ensure that its HIPAA business associate, PJ&A, met the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework

Version 1.1 (including, but not limited to, PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81.     Such frameworks are the existing and applicable industry standards in the healthcare industry. Northwell failed to ensure that PJ&A complied with these accepted standards, thus opening the door to criminals and the Data Breach.

***Northwell and PJ&A Violated HIPAA***

82.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[22]

83.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[23]

84.     The Data Breach itself resulted from a combination of inadequacies showing Northwell and PJ&A failed to comply with safeguards mandated by HIPAA. PJ&A's security failures include, but are not limited to:

---

[22]   HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[23]   *See* 45 C.F.R. §164.306 (security standards and general rules); 45 C.F.R. §164.308 (administrative safeguards); 45 C.F.R. §164.310 (physical safeguards); 45 C.F.R. §164.312 (technical safeguards).

(a)    Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. §164.306(a)(1);

(b)    Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. §164.306(a)(2);

(c)    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

(d)    Failing to ensure compliance with HIPAA security standards by Northwell's and PJ&A's workforce in violation of 45 C.F.R. §164.306(a)(4);

(e)    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

(f)    Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

(g)    Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

(h)    Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. §§164.308(a)(5) and 164.530(b); and

(i)    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. §164.530(c).

- 18 -

85.     Northwell's security failures include preventing its HIPAA business associate PJ&A's failures listed in the preceding paragraph.

86.     Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrates Northwell and PJ&A failed to comply with safeguards mandated by HIPAA regulations.

***The Experiences and Injuries of Plaintiff and Class Members***

87.     Plaintiff and Class Members are current and former employees of Northwell and its subsidiaries.

88.     Plaintiff and Class Members provided valuable consideration (directly or indirectly) – including monies, services, PHI, and PII – to Northwell and its subsidiaries in exchange for certain services. A portion of said consideration (and the profits derived from such) was intended to have been used by Northwell for data security measures to secure Plaintiff's and Class Members' PII and PHI.

89.     As a prerequisite of receiving employment, treatment, and/or services, Northwell requires its employees – like Plaintiff and Class Members – to disclose their PII and PHI.

90.     When PJ&A and Northwell finally announced the Data Breach, they deliberately underplayed the Data Breach's severity and obfuscated the nature of the Data Breach. PJ&A's Notice sent to Plaintiff and Class Members fails to explain how the breach occurred (what security weakness was exploited), who the Data Breach was perpetrated by, and the extent to which those data elements were compromised.

91.     Because of the Data Breach, Northwell inflicted injuries upon Plaintiff and Class Members. As yet, Northwell has done little to provide Plaintiff and Class Members with relief for the damages they suffered.

92.     All Class Members were injured when Northwell allowed their PII and PHI to be exfiltrated from PJ&A by cybercriminals.

93.     Plaintiff and Class Members entrusted their PII and PHI to Northwell. Thus, Plaintiff and Class Members had the reasonable expectation and understanding that Northwell would take – ***at minimum*** – industry standard and legally mandated precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, as well as industry standard and legally mandated precautions to ensure that its vendors protect, maintain and safeguard their PII and PHI, and would timely notify them of any data security incidents. After all, Plaintiff and Class Members would not have entrusted their PII and PHI to Northwell had they known that Northwell would not take reasonable steps to safeguard their information.

94.     Plaintiff and Class Members suffered actual injury from having their PII and PHI compromised in the Data Breach, including, but not limited to: (a) damage to and diminution in the value of their PII and PHI – a form of property that Northwell obtained from Plaintiff and Class Members and provided to PJ&A; (b) violation of their privacy rights; (c) the theft of their PII and PHI; (d) fraudulent activity resulting from the Data Breach; (e) present and continuing injury arising from the increased risk of additional identity theft and fraud, such as the time and money spent mitigating the harm of the Data Breach.

95.     Moreover, because of the Data Breach, Plaintiff and Class Members have spent – and will continue to spend – considerable time and money to try to mitigate and address harms caused by the Data Breach.

***Plaintiff and Class Members Face Significant Risk of Present and Continuing Identity Theft***

96.     Plaintiff and Class Members suffered injury from the misuse of their PII and PHI that can be directly traced to Northwell.

4878-4490-2303.v1

97.    The ramifications of Northwell's failure to keep Plaintiff's and Class Members' PII and PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

98.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[24]

99.    As a result of Northwell's failures to prevent – and to timely detect and timely notify Plaintiff and Class Members of – the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses and lost time. More specifically, they have suffered or are at an increased risk of suffering:

(a)    The loss of the ability to control how their PII and PHI is used;

(b)    The diminution in value of their PII and PHI;

(c)    The compromise and continuing publication of their PII and PHI;

(d)    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

(e)    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

---

[24]    *More Than 12 Million Identity Fraud Victims in 2012 According to Latest Javelin Strategy & Research Report*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research#:~:text=The%20study%20found%2012.6%20million,to%20be%20the%20most%20da maging.

(f)    Delay in receipt of tax refund monies;

(g)    Unauthorized use of stolen PII and PHI; and

(h)    The continued risk to their PII and PHI, which remains in the possession of PJ&A and Northwell and is subject to further breaches so long as PJ&A and Northwell fail to undertake the appropriate measures to protect the PII and PHI in their possession.

100.    Stolen PII and PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII and PHI can be worth up to $1,000.00 depending on the type of information obtained.[25]

101.    The value of Plaintiff's and Class Members' PII and PHI on the black market is considerable. Stolen PII and PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various Dark Web internet websites, making the information publicly available, for a substantial fee.

102.    It can take victims years to spot or identify PII and PHI theft, giving criminals plenty of time to milk that information for cash.

103.    One such example of criminals using PII and PHI for profit is the development of "Fullz" packages.[26]

---

[25]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[26]    "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information one has on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the Dark Web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account)

- 22 -

104.    Cyber-criminals can cross-reference two sources of PII and PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

105.    The development of "Fullz" packages means that stolen PII and PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII and PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen PII and PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

106.    According to the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

107.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." PJ&A and Northwell did not rapidly report to Plaintiff and Class Members that their PII and PHI had been stolen.

---

without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sept. 18, 2014), https://krebsonsecurity.com/tag/fullz/.

108.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

109.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend considerable time repairing the damage caused by the theft of their PII and PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

110.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII and PHI. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

111.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[27]

112.    An active and robust consumer marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28] The data marketplace is so sophisticated that

---

[27] *Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[28] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29] [30] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[31]

113.    As a result of the Data Breach, Plaintiff's and Class Members' PII and PHI, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII and PHI is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

114.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[32] According to the FTC, data security requires: (a) encrypting information stored on computer networks; (b) retaining payment card information only as long as necessary; (c) properly disposing of personal information that is no longer needed; (d) limiting administrative access to business systems; (e) using industry-tested and accepted methods for securing data; (f) monitoring activity on networks to uncover unapproved activity; (g)

---

[29]    David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[30]    Datacoup, *The personal data revolution: It's time to capture, control and profit from your personal data*, https://datacoup.com/ (last visited Jan. 3, 2024).

[31]    WORLD DATA EXCHANGE, https://worlddataexchange.com/ (last visited Jan. 3, 2024).

[32]    *Start With Security*, *supra* note 19.

verifying that privacy and security features function properly; (h) testing for common vulnerabilities; and (i) updating and patching third-party software.[33]

115.    According to the FTC, unauthorized PII and PHI disclosures are extremely damaging to consumers' finances, credit history, and reputation and can take time, money, and patience to resolve the fallout.[34] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

116.    To that end, the FTC has sued businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In re Lookout Servs., Inc.*, No. C-4326, ¶7 (FTC June 15, 2011) ("[the company] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In re DSW, Inc.*, No. C-4157, ¶7 (FTC Mar. 7, 2006) ("[the company] failed to employ sufficient measures to detect unauthorized access."); *In re TJX Cos., Inc.*, No. C-4227 (FTC July 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In re Dave & Buster's Inc.*, No. C-4291 (FTC May 20, 2010) ("[the company] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal

---

[33]    *Id.*

[34]    *See Taking Charge, What to Do if Your Identity Is Stolen*, Fed. Trade Comm'm, at 3 (Jan. 2012),    https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

4878-4490-2303.v1

information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These filings, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Northwell and PJ&A thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII and PHI.

117.    The healthcare industry is a prime target for data breaches.

118.    Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the United States exceeded 1,000, a 40% increase from 2015.[35] The next year, that number increased by nearly 45%.[36] The following year the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[37]

119.    Data breaches within the healthcare industry continued to increase rapidly. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 68% of participating vendors reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[38]

---

[35]    *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RES. CTR. (Jan. 20, 2017), https://bit.ly/30Gew91 (hereinafter, "*Data Breaches Increase 40 Percent in 2016*").

[36]    *Data Breaches Up Nearly 45 Percent According to Annual Review by Identity Theft Resource Center® and CyberScout®*, IDENTITY THEFT RES. CTR. (Jan. 22, 2018), https://bit.ly/3jdGcYR (hereinafter, "*Data Breaches Up Nearly 45 Percent*").

[37]    *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RES. CTR. (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[38]    *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFO. & MGMT. SYS. SOC'Y, INC. (Feb. 8, 2019), https://bit.ly/3LJqUr6.

120.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[39] Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[40] Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[41]

121.    The healthcare industry has "emerged as a primary target because [it sits] on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, ha[s] so much monetizable information stored in their data centers."[42]

122.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida

---

[39]  *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RES. CTR. (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[40]  Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://cnet.co/33uiV0v.

[41]  *Id.*

[42]  Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://bit.ly/3x6fz08.

4878-4490-2303.v1

Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Northwell knew or should have known that its electronic records, whether in its own hands or the hands of its business associates, would be targeted by cybercriminals.

123.    Charged with handling highly sensitive PII and PHI including healthcare information, financial information, and insurance information, Northwell knew or should have known the importance of safeguarding the PII and PHI that was entrusted to it. Northwell also knew or should have known of the foreseeable consequences if its data security systems or the data security systems of its HIPAA business associates were breached. This includes the significant costs that would be imposed on Northwell's patients as a result of a breach. Northwell nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

124.    PJ&A disclosed Plaintiff's and Class Members' PII and PHI for criminals to use in the conduct of criminal activity. Specifically, PJ&A opened, disclosed, and failed to adequately protect Plaintiff's and Class Members' PII and PHI from people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen PII and PHI.

125.    PJ&A's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy and a clear violation

of HIPAA, and has failed to adequately protect the PII and PHI of Plaintiff and potentially millions of Class Members to unscrupulous operators, con artists, and outright criminals.

126.    Northwell failed to adequately protect its employees' and patients' PII and PHI by failing to ensure that PJ&A had adequate data security measures in place.

127.    Northwell's failure to properly and timely notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4).

129.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All current and former employees of Northwell or its subsidiaries to whom PJ&A sent a Notice of the Data Breach (the "Class").

130.    The Class defined above is readily ascertainable from information in Northwell and PJ&A's possession. Thus, identification of Class Members will be reliable and administratively feasible.

131.    Excluded from the Class are: (a) any judge presiding over this action and members of their families; (b) Northwell and its subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which they or their parent has a controlling interest, and their current or former officers and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on

4878-4490-2303.v1

the merits or otherwise released; (e) Plaintiff's counsel and Northwell's counsel; (f) members of the jury; and (g) the legal representatives, successors, and assigns of any such excluded persons.

132.    Plaintiff reserves the right to amend or modify the Class definition(s) – including potential subclasses – as this case progresses.

133.    Plaintiff and Class Members satisfy the numerosity, commonality, typicality, and adequacy requirements under Rule 23(a).

134.    ***Numerosity***. The Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of nearly 100,000 individuals whom PJ&A sent a Notice of the Data Breach.

135.    ***Commonality***. There are many questions of law and fact common to the Class. These common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, but are not limited to:

(a)    whether Northwell and PJ&A unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII and PHI;

(b)    whether Northwell and PJ&A failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(c)    whether PJ&A's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

(d)    whether PJ&A's data security systems prior to and during the Data Breach were consistent with industry standards;

(e)    whether Northwell, as a "covered entity" under HIPAA, was required to monitor, oversee, and/or ensure PJ&A's compliance with HIPAA as Northwell's HIPAA "business associate";

(f)    whether Northwell owed a duty to Class Members to safeguard their PII and PHI;

(g)    whether Northwell breached its duty to Class Members to safeguard their PII and PHI;

(h)    whether Northwell knew or should have known that PJ&A's data security systems and monitoring processes were deficient;

(i)    whether Northwell took reasonable measures to determine the extent of the Data Breach after it was discovered;

(j)    whether Northwell unreasonably delayed notifying Plaintiff and Class Members of the Data Breach;

(k)    whether Northwell's conduct was negligent;

(l)    whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

(m)    whether Plaintiff and Class Members suffered legally cognizable damages as a result of Northwell's misconduct; and

(n)    whether Plaintiff and Class Members are entitled to damages and/or injunctive relief.

136.    ***Typicality***. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, received a Notice of the Data Breach from Defendants that their PII and/or PHI was compromised in the Data Breach. Moreover,

Plaintiff and all Class Members were subjected to Northwell's uniformly illegal and impermissible conduct.

137.    ***Adequacy of Representation***. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's counsel are competent and experienced in litigating complex class actions. Plaintiff has no interests that conflict with, or are antagonistic to, those of the Class.

138.    ***Predominance***. Northwell engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' data was stored on the same network system and unlawfully and inadequately protected in the same way. The common issues arising from Northwell's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

139.    ***Superiority***. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Northwell. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

140.    The litigation of the claims brought herein is manageable. Northwell's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

141.    Adequate notice can be given to Class Members directly using information maintained in Northwell's and PJ&A's records.

142.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

143.    Northwell acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

**FIRST CAUSE OF ACTION**

**<u>NEGLIGENCE</u>**
**(On Behalf of Plaintiff and the Class)**

144.    Plaintiff repeats the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

145.    Northwell owed several common law duties to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII and PHI within its control from being accessed, compromised, exfiltrated, and stolen by criminal third parties in foreseeable cyber-crimes.

146.    First, a common law duty arose by the foreseeability of the cyber-crimes. Due to the ongoing threat and highly publicized cyber-attacks businesses like Northwell and PJ&A that

- 34 -

acquire and store PII and PHI, Northwell was on notice of the substantial and foreseeable risk of a cyber-attack on its systems and the systems of its business associates, and that Plaintiff and Class Members would be harmed if Northwell or PJ&A did not protect Plaintiff's and Class Members' PII and PHI from threat actors.

147.    Northwell knew or should have known that PJ&A's systems were vulnerable to unauthorized access and exfiltration by criminal third parties. Northwell knew, or should have known, of the importance of safeguarding Plaintiff's and Class Members' PII and PHI – including Social Security number, taxpayer identification number, medical information, and health insurance information.

148.    Northwell further knew or should have known of the foreseeable consequences and harm to Plaintiff and Class Members, if PJ&A's data security system and network were breached – including, specifically, the risk of identity theft and related costs imposed on Plaintiff and Class Members as a result of a data breach. Northwell knew or should have known about these risk and dangers to Plaintiff and Class Members and taken steps to strengthen PJ&A's data, information technology, and email handling systems accordingly.

149.    Second, by obtaining, collecting, using, retaining, and deriving benefits from Plaintiff's and Class Members' PII and PHI, Northwell assumed the legal duty to protect Plaintiff's and Class Members' PII and PHI from foreseeable cyber-crimes.

150.    Third, Northwell's duty to use reasonable data security measures arose as a result of the special relationship that existed between Northwell and Plaintiff and Class Members. The special relationship arose because Northwell received Plaintiff's and Class Members' confidential data as part of its provision of medical services to Plaintiff and Class Members. Northwell was in

4878-4490-2303.v1

the sole position to ensure that it had sufficient safeguards to protect against the harm to Plaintiff and Class Members that would result from a data breach.

151.    Finally, Northwell's duties arose by statute under Section 5 of the FTC Act, 15 U.S.C. §45, which prohibits "unfair or deceptive acts or practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information. Various FTC publications and data security breach orders further form the basis of Northwell's duty.

152.    Northwell breached its common law and statutory duties by failing to provide data security consistent with industry standards to ensure that PJ&A's systems and networks adequately protected the PII and PHI it had been entrusted against foreseeable cyber-crimes. Northwell did not use reasonable security procedures and practices appropriate for the nature of the sensitive information PJ&A was maintaining, causing Plaintiff's and Class Members' PII and PHI to be exposed. As a result, Northwell increased the foreseeable risk to Plaintiff and Class Members that their PII and PHI would be compromised and stolen in a cyber-crime.

153.    Plaintiff's and Class Members' PII and PHI would not have been compromised in the Data Breach but for Northwell's wrongful and negligent breach of its duties.

154.    Neither Plaintiff nor, upon information and belief, the other Class Members contributed to the Data Breach or subsequent misuse of their PII and PHI as described in this Complaint.

155.    Northwell breached its duties to Plaintiff and Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard PJ&A's computer systems and data. Upon information and belief, Northwell could have prevented this Data Breach

by ensuring that PJ&A encrypted or adequately encrypted, or otherwise protected PJ&A's equipment and computer files containing Plaintiff's and Class Members' PII and PHI.

156.    Upon information and belief, Northwell's negligent conduct also includes, but is not limited to, one or more of the following acts and omissions:

(a)    failing to ensure that PJ&A maintained and updated an adequate data security system to reduce the risk of data breaches;

(b)    failing to ensure that PJ&A adequately trained its employees to protect consumers' PII and PHI;

(c)    failing to ensure that PJ&A adequately monitored, evaluated, and ensured the security of its network and systems;

(d)    failing to ensure that PJ&A properly monitored its data security systems for existing intrusions;

(e)    failing to ensure that PJ&A complied with the minimum FTC guidelines for cybersecurity, in violation of the FTC Act;

(f)    failing to ensure that PJ&A adhered to industry standards for cybersecurity;

(g)    failing to ensure that PJ&A encrypted or adequately encrypted the PII and PHI; and

(h)    failing to ensure that PJ&A implemented reasonable data retention policies.

157.    Furthermore, Northwell was plainly aware that its HIPAA business associates should destroy any PII and PHI that they no longer needed to provide services, or at least should have ensured extra precautions were taken to secure such PII and PHI since, under such circumstances, there was effectively no longer a "legitimate business 'need to know'" for its business associates accessing it.

- 37 -

158.    As a direct and proximate result of Northwell's negligent acts and/or omissions, Plaintiff's and Class Members' PII and PHI was compromised, and they are all at a high risk of identity theft and financial fraud for many years to come. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the risk of future identity theft; (b) loss of time and loss of productivity incurred mitigating the risk of future identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of PII and PHI; and (f) the continued risk to their PII and PHI, which remains in the possession of Defendants, and which is subject to further breaches, so long as Northwell fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' sensitive information.

159.    Plaintiff seeks to remedy these harms, and to prevent the future occurrence of an additional data breach, on behalf of herself and all similarly situated persons whose PII and PHI were compromised as a result of the Data Breach. Plaintiff seeks compensatory damages for loss of time, opportunity costs, out-of-pocket costs, and injunctive relief including improvements to Northwell's vendor risk management program and adequate credit monitoring services funded by Northwell.

160.    Accordingly, Plaintiff, individually and on behalf of all those similarly situated, seek an Order awarding damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

161.    Plaintiff repeats the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

162.    The FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Northwell and PJ&A, of failing to use reasonable measures to protect PII. 15 U.S.C. §45(a)(1).

163.    The FTC publications and orders described above also form part of the basis of Northwell's duty in this regard.

164.    Northwell violated the FTC Act by failing to use reasonable measures to ensure that PJ&A protected PII and PHI and complied with applicable industry standards. Northwell's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained, stored, and disseminated to PJ&A, and the foreseeable consequences of a data breach involving companies like PJ&A, including, specifically, the immense damages that would result to Plaintiff and Class Members.

165.    Northwell's violations of the FTC Act, as interpreted by the FTC to include a duty to employ adequate and reasonable data security measures, constitute negligence *per se*.

166.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

167.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

168.    Additionally, Northwell is an entity and PJ&A is a business associate covered by HIPAA (45 C.F.R. §160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the

Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

169.    HIPAA requires Northwell and PJ&A to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(c)(1). HIPAA also requires covered entities' business associates to appropriately safeguard the protected health information they receive or create on behalf of covered entities. 45 C.F.R. §§164.502(e), 164.504(e), 164.532(d)-(e). The PII and PHI at issue in this case constitutes "protected health information" within the meaning of HIPAA.

170.    HIPAA further requires Northwell and PJ&A to disclose the unauthorized access and theft of Plaintiff's and Class Members' PII and PHI to "without unreasonable delay" so that Plaintiff and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII and PHI. *See* 45 C.F.R. §§164.404, 164.406, 164.410.

171.    Northwell directly violated HIPAA by failing to reasonably protect Plaintiff's and Class Members' PII and PHI, as described herein, including failing to monitor and oversee PJ&A's compliance with HIPAA.

172.    Northwell's violations of HIPAA constitute negligence *per se*.

173.    Plaintiff and Class Members are within the class of persons that HIPAA was intended to protect.

174.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

175.    As a direct and proximate result of Northwell's negligent *per se* acts and/or omissions, Plaintiff's and Class Members' PII and PHI was compromised, and they are all at a high risk of identity theft and financial fraud for many years to come. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the risk of future identity theft; (b) loss of time and loss of productivity incurred mitigating the risk of future identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of PII and PHI; and (f) the continued risk to their PII and PHI, which remains in the possession of Northwell or PJ&A, and which is subject to further breaches, so long as Northwell or PJ&A fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII and PHI.

176.    Plaintiff seeks to remedy these harms, and to prevent the future occurrence of an additional data breach, on behalf of themselves and all similarly situated persons whose PII and PHI were compromised as a result of the Data Breach. Plaintiff seeks compensatory damages for loss of time, opportunity costs, out-of-pocket costs, and injunctive relief including improvements to Northwell's vendor risk management program and adequate credit monitoring services funded by Defendants.

177.    Accordingly, Plaintiff, individually and on behalf of all those similarly situated, seek an Order awarding damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### <u>VIOLATION OF N.Y. GBL §349</u>
### (On Behalf of Plaintiff and the Class)

178.    Plaintiff repeats the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

179.    Northwell engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law §349, including:

(a)    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII and PHI, which was a direct and proximate cause of the Data Breach;

(b)    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

(c)    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Member' PII and PHI, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. §45, and HIPAA, 42 U.S.C. §1320d, which was a direct and proximate cause of the Data Breach;

(d)    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' PII and PHI, including by implementing and maintaining reasonable security measures;

(e)    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII and PHI, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. §45, and HIPAA, 42 U.S.C. §1320d;

(f)    Failing to timely and adequately notify Plaintiff and Class Members of the Data Breach;

(g)    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII and PHI; and

(h)    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII and PHI, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. §45, and HIPAA, 42 U.S.C. §1320d.

180.    Northwell's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Northwell's and its vendors' data security and ability to protect the confidentiality of Plaintiff's and Class Members' PII and PHI.

181.    Northwell's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and Class Members, that their PII and PHI would not and had not been exposed and misled Plaintiff and the Class Members into believing they did not need to take actions to secure their identities.

182.    Northwell acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff's and Class Members' rights.

183.    As a direct and proximate result of Northwell's deceptive and unlawful acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII and PHI.

184.    Northwell's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers affected by the Data Breach.

185.    The above deceptive and unlawful practices and acts by Northwell caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid.

186.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, treble damages, injunctive relief, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiff as Class representative and the undersigned as Class counsel;

B.    A mandatory injunction directing Northwell to adequately safeguard Plaintiff's and Class Members' PII and PHI hereinafter by complying with HIPAA, and implementing improved security and vendor risk management procedures and measures, including, but not limited to, an Order:

1.    Prohibiting Northwell from engaging in the wrongful and unlawful acts described herein;

2.    Requiring Northwell to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

3.    Requiring Northwell to delete and purge the PII and PHI of Plaintiff and Class Members unless they can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

- 44 -

4.     Requiring Northwell to require all HIPAA business associates to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII and PHI;

5.     Requiring Northwell to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on its HIPAA business associates' systems on a periodic basis;

6.     Prohibiting Northwell from allowing its HIPAA business associates to maintain Plaintiff's and Class Members' PII and PHI on a cloud-based database until proper safeguards and processes are implemented;

7.     Requiring Northwell to mandate its HIPAA business associates segment data by creating firewalls and access controls so that, if one area of their network is compromised, hackers cannot gain access to other portions of their systems;

8.     Requiring Northwell to conduct regular database scanning and securing checks of its HIPAA business associates;

9.     Requiring Northwell to ensure that its HIPAA business associates monitor ingress and egress of all network traffic;

10.     Requiring Northwell to ensure its HIPAA business associates establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII and PHI, as well as protecting Plaintiff's and Class Members' PII and PHI;

11.     Requiring Northwell to ensure its HIPAA business associates implement a system of tests to assess their respective employees' knowledge of the education programs

- 45 -

discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with their policies, programs, and systems for protecting personal identifying information;

12.    Requiring Northwell to ensure its HIPAA business associates implement, maintain, review, and revise as necessary a threat management program to appropriately monitor their networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

13.    Appointing a qualified independent auditor to ensure compliance with the injunctive relief imposed by the Court, and to report to the Court and to Plaintiff's counsel periodic reports as appropriate of such auditor's assessment of compliance, including any failure to cure deficiencies in compliance with the Court's injunctive relief.

C.    A mandatory injunction requiring that Northwell provide notice to each Class Member relating to the full nature and extent of the Data Breach and the disclosure of PII and PHI to unauthorized persons;

D.    Enjoining Northwell from further deceptive practices and making untrue statements about the Data Breach and the stolen PII and PHI;

E.    An award of damages, including actual, nominal, consequential damages, statutory damages, treble damages, and punitive damages, as allowed by law in an amount to be determined;

F.    An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.    Granting Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.      For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.      Such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.

DATED:  January 22, 2024                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            ROBERT M. ROTHMAN
                                            MARIO ALBA, JR.


                                            _____
                                                   */s/ Robert M. Rothman*
                                            ROBERT M. ROTHMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com
                                            rrothman@rgrdlaw.com
                                            malba@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                            STUART A. DAVIDSON
                                            LINDSEY H. TAYLOR
                                            ALEXANDER C. COHEN
                                            225 NE Mizner Boulevard, Suite 720
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)
                                            sdavidson@rgrdlaw.com
                                            ltaylor@rgrdlaw.com
                                            acohen@rgrdlaw.com

                                            Attorneys for Plaintiff and the Class